IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| RODNEY STRAUGHN, | § | CV. NO. 5:13-CV-708-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| TEXAS POWERTRAIN ASSEMBLY, | § | |
| LLC, and CATERPILLAR, INC. | § | |
| | § | |
| Defendant. | § | |
| _____ | § | |

ORDER (1) GRANTING IN PART AND DENYING IN PART TPA'S MOTION TO
STRIKE; (2) GRANTING IN PART AND DENYING IN PART TPA'S MOTION
FOR SUMMARY JUDGMENT; (3) GRANTING CATERPILLAR'S MOTION FOR
SUMMARY JUDGMENT

On October 2, 2014, the Court held a hearing on the Motions for

Summary Judgment filed by Defendants Texas Powertrain Assembly, LLC ("TPA")

and Caterpillar, Inc. ("Caterpillar") (collectively, "Defendants") ("TPA Mot.," Dkt.

# 23; "Cat. Mot.," Dkt # 22).  Alan Braun, Esq., and Mark Anthony Acuña, Esq.,

appeared on behalf of Plaintiff Rodney Straughn ("Plaintiff" or "Straughn");

Raymond Bissmeyer, Esq., and Ricardo E. Vielledent, Esq., appeared on behalf of

TPA; and Kate L. Birenbaum, Esq., appeared on behalf of Caterpillar.  After careful

consideration of the memoranda in support of and in opposition to the Motions, and

in light of the parties' arguments at the hearing, the Court, for the reasons that

follow, **GRANTS IN PART AND DENIES IN PART** TPA's Motion for

Summary Judgment (Dkt. # 23) and **GRANTS** Caterpillar's Motion for Summary

Judgment (Dkt. # 22).  In conjunction with this ruling, the Court also **GRANTS IN**

**PART AND DENIES IN PART** TPA's Motion to Strike (Dkt. # 29.)

BACKGROUND

I.      Factual Background

In June 2011, Straughn, who is African-American, began working as a

forklift operator for TPA at the Caterpillar-owned, TPA-operated facility in Seguin,

Texas.  (Dkt. # 25, Ex. 2 ("TPA Straughn Aff.") ¶ 2; TPA Mot., Ex. B ¶ 2.)  TPA

contends that Straughn's employment began on September 26, 2011.  (TPA Mot.,

Ex. B ¶ 2.)  While at TPA, David Patrick ("Patrick") and Melchor De Los Santos

("Santos") were Straughn's supervisors.  (Dkt. # 25, Ex. 1 ("TPA Straughn Dep.") at

39:9; TPA Mot., Ex. C at 14:10–14:12; id., Ex. E at 20:7–20:12.)

Straughn alleges that, during his time at TPA, his coworkers subjected

him to discriminatory conduct.  The first incident occurred three days after he

started on the job, when Straughn's coworker and team leader Jeremy Rangel

("Rangel") (TPA Mot., Ex. A at 5) allegedly said something to the effect of "What's

up, my nigger."  (TPA Straughn Dep. at 150:5–150:16.)

About a week or two later, according to Straughn, Rangel hung a noose

2

in the work area, pointed out the noose to Straughn and said "Right there, that is where we hang niggers at" (the "Noose Incident").[1]  (Id. at 151:20–152:8.) Straughn reported the comments to Patrick and Area Manager Ron Burrell ("Burrell").  (Id. at 151:24–151:25.)  Patrick called an informal meeting with Straughn, Rangel, and another employee that was involved in the incident.  (Id. at 152:10–152:12.)  Patrick asked the group what they wanted to do about the incident and stated that if he took the incident to Human Resources, Rangel would be terminated.  (Id. at 152:14–153:5.)  Straughn replied that he did not want to get anyone in trouble and asked that they leave him alone.  (Id. at 152:14–15, 153:24–154:5.)  Rangel was not disciplined.  (Id. at 154:6–154:7.)

In January 2012, another co-worker, Jason Garcia, became angry after he was told that Ellis, a TPA employee, directed Straughn to move boxes from an aisle where Garcia wanted to unload containers.  (Id. at 154:17–155:14, 161:1–161:3.)  Garcia said to Straughn, "You ain't shit, you are Ellis' bitch" and "I will fucking kill you nigger you ain't shit" (the "Garcia Incident"). (Id. 154:17–154:18, 155:10–155:11; TPA Straughn Aff. ¶ 12.)  Upon returning to work the next day and

---

[1] The Court notes that TPA presents a different version of these facts; specifically, that the comment arose out of "casual conversation" and "racial jokes," and that the noose was a strand of shrink-wrap that was there already, not hung by another worker.  (TPA Mot. at 5, 17.)  However, as Straughn correctly argues, at the summary judgment phase, the Court must take the facts in the light most favorable to the plaintiff.  See Kevin M. Ehringer Enters., Inc. v. McData Servs. Corp., 646 F.3d 321, 326 (5th Cir. 2011).

learning that Garcia was still working, Straughn made a complaint to Burrell about the incident.  (TPA Straughn Aff. ¶ 13.)  Burrell indicated that he had not been told about the specifics of the incident and apologized to Straughn.  (Id.)  Meanwhile that day, Santos launched an investigation with Human Resources after he was made aware of the incident by witnesses.  (TPA Mot., Ex. E ("Santos Dep.") at 12:16–14:2.)  The investigation resulted in Garcia's termination later that day.  (Id. at 12:16–14:2; TPA Straughn Dep. at 155:20–155:22.)

On six occasions thereafter, employees called Straughn "nigger" in retaliation for what they perceived to be Straughn's role in Garcia's termination. (TPA Straughn Dep. at 156:7–157:1; TPA Straughn Aff. ¶ 15.)  Straughn reported the conduct to Patrick.  (TPA Straughn Dep. at 157:9–157:16; TPA Straughn Aff. ¶ 15.)  In response, Patrick told the employees that they needed to treat each other as equals.  (TPA Straughn Dep. at 157:15–157:18; TPA Straughn Aff. ¶ 15.)

On at least thirteen occasions while Straughn was working at TPA, he observed graffiti and writing using racist symbols and/or language.  Three of those observations occurred in the men's restroom.  On one occasion, Straughn observed graffiti in the men's restroom that read "I do not like Blacks."  (TPA Straughn Dep. 166:8–168:5.)  Straughn did not report this incident because fellow employees had already complained about the graffiti before he saw it.  (Id. at 166:19–167:5.)  On a second occasion, Straughn saw "KKK" written in the men's restroom.  (Id. at

167:7–167:22.)  The writing had been painted over but was still visible.  (Id.)

Straughn did not report this incident.  (Id.)  On a third occasion, Straughn observed a

Nazi symbol in the men's restroom that had been painted over but was still visible.

(Id. at 167:23–168:9.)

On four occasions, Straughn observed "KKK" written on his forklift.

(Id. at 174:14–174:18.)  He reported at least some of these incidents to team lead

Hector Alejandro.  (Id. at 174:19–174:22.)  On two occasions, Straughn observed

"KKK" written on fans.  (Id. at 175:4–175:8.)  When he reported the observations to

Ellis, Ellis wiped down the face of the fans to remove the graffiti.  (Id. at 175:11–

175:13.)  Finally, on four or five occasions, Straughn observed racist statements

written on his log-in sheet.  (Id. at 175:16–175:22, 176:12–176:14.)  Straughn

reported these incidents to Ellis by showing him the sheet.  (Id. at 176:3–176:18.)

Additionally, on at least two occasions while working with TPA,

Straughn applied for promotions to become a team lead.  (Id. at 190:8–191:5.)  In

both instances, Patrick encouraged Straughn to apply.  (Id.)  However, in both

instances, he did not receive the promotion.  (Id.)

On June 20, 2012, Straughn filed a Charge of Discrimination against

TPA with the EEOC (the "First Charge").  (TPA Straughn Aff. ¶ 25; TPA Mot., Ex.

A at 4.)  The charge alleged racist and offensive behavior from October 2011 to the

date of filing, including the threats made by Garcia, the noose comments made by

Rangel, and two instances of graffiti, including the graffiti in the women's restroom. (Id.)

Thereafter, the EEOC launched an investigation, which concluded on November 19, 2012, with a Letter of Determination finding that Straughn and a class of African-American individuals at TPA were subjected to actionable harassment based on their race in violation of Title VII.  (Dkt. # 25, Ex. 4.)

On February 1, 2013, TPA transferred the operations of the facility to Caterpillar, and Straughn became Caterpillar's employee.[2]  (TPA Straughn Dep. 25:10–26:9.)  In March 2013, Straughn observed graffiti in the men's restroom that read "Niggers ain't shit.  KKK rules."  (Dkt. # 26, Ex. 1 ("Cat. Straughn Dep.") at 54:17–54:25.)  Additionally, Straughn observed graffiti in the women's restroom that read "I hate Black nigger monkeys ha, ha," "KKK," and "kill all niggers." (TPA Straughn Dep. 56:18–58:5, 168:10: 168:14; Dkt # 25, Ex. 11.)  TPA had the graffiti painted over within thirty minutes of Straughn's observation.  (TPA Straughn Dep. 169:9–169:13.)

On May 10, 2013, Caterpillar team lead Randy Medina ("Medina") passed by Straughn while Straughn was coming into work.  (Cat. Straughn Dep. at 65:7–65:25.)  As Medina passed, Straughn heard him say "Bitch ass nigga."  (Id.)

_____

[2] The Court notes that the record is unclear as to the methods and terms of the transfer.

Although Straughn was wearing headphones at the time, his headphones were not turned on.  (Id.)  Straughn did not say anything in response.  (Id. at 68:7–68:9.) Later that morning, another team lead Dustin Venecia ("Venecia") informed Straughn that Medina was going to try to get Straughn fired.  (Id. at 68:23–69:1.) Straughn subsequently reported the incident to Human Resources.  (Id. at 69:5–69:8.)

Within two days of the report, two of Caterpillar's Human Resources employees from Mississippi investigated the incident.  (Id. at 83:12–83:23.) Thereafter, Caterpillar told Straughn that he would no longer have to report to Venecia or Medina as his team lead.  (Id. at 87:1–87:13.)  In so doing, Caterpillar did not cause Straughn to lose his job, nor did it demote Straughn or reduce his pay. (Id.)

Sometime during 2013, Straughn also learned that an employee was terminated after he said "We don't like Blacks" and made threats that he would kill employees.  (Id. at 60:13–61:5.)  Although Straughn did not hear these comments directly, he began parking his car in a part of the company parking lot that was visible to security cameras.  (Id. at 60:15–60:16; 62:3–63:25.)  However, Straughn did not report the comments to his supervisor.  (Id. at 61:10–61:21, 63:1–63:21.)

Sometime during 2013, Straughn also applied for a promotion to become team lead with Caterpillar.  (Id. at 28:21–28:22.)  Straughn did not get the

7

promotion.  (Id. at 38:13–38:14.)  Burrell informed him that he did not get the job

because his communication skills were inadequate.[3]  (Id. at 40:16–40:23.)

On May 13, 2013, Straughn filed a second Charge of Discrimination

with the EEOC (the "Second Charge"), citing Medina's remark and the allegations

that Medina was trying to get Straughn fired.  (Dkt # 26, Ex. 4.)  On May 20, 2013,

finding no conclusive evidence that there was an actionable violation under Title

VII, the EEOC provided Straughn with a notice of Right to Sue.  (Dkt. # 26, Ex. 3.)

II.     Procedural Background

On August 6, 2013, Straughn filed a complaint in this Court, naming

TPA and Caterpillar as defendants.  (Dkt. # 1.)  He asserted claims of racial

harassment, failure to promote, hostile work environment, and retaliation in

violation of Section 703(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e-2(a).  (Id.)  Straughn sought back pay; compensation for past and future

mental anguish, emotional pain, suffering, loss of enjoyment of life, and

humiliation; exemplary damages; and attorney's fees.  (Id. at 7.)

On April 24, 2014, Defendants each submitted Motions for Summary

Judgment (Dkts. ## 22, 23.)  Straughn submitted responses to each motion on May

---

[3] Although Caterpillar presents conflicting evidence that Burrell was never an
employee of Caterpillar at the Seguin location (Dkt. # 22, Ex. B at 2), the Court
cannot make credibility determinations or weigh evidence at the summary judgment
stage.  See Kevin M. Ehringer Enters., 646 F.3d at 326.

15, 2014.  (Dkts. ## 25, 26.)  Defendants each submitted their replies on May 22, 2014.  (Dkts. ## 27, 28.)  Straughn subsequently submitted a sur-reply supplementing the summary judgment evidence in his TPA Response on May 29, 2014.  (Dkt. # 30.)

On May 22, 2014, TPA submitted a Motion to Strike, challenging various aspects of Straughn's summary judgment evidence.  (Dkt. # 29.)  Straughn submitted a response on May 29, 2014, to which TPA replied on June 5, 2014.  (Dkts. ## 31, 33.)  On October 10, 2014, the Court granted Straughn leave to file supplemental briefing to clarify additional issues that arose during the hearing.  (Dkt. # 38.)  On October 17, TPA timely filed a Response to Straughn's supplemental briefing.  (Dkt. # 39.)

## LEGAL STANDARD

A movant is entitled to summary judgment upon showing that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); see also Meadaa v. K.A.P. Enterprises, L.L.C., 756 F.3d 875, 880 (5th Cir. 2014).  A dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, the nonmoving party must come

forward with specific facts that establish the existence of a genuine issue for trial.

Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th

Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir.

2000)).  "Where the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party, there is no 'genuine issue for trial.'"  Hillman v.

Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsushita Elec. Indus. Co., Ltd.

v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

 In deciding whether a fact issue has been created, "the court must draw

all reasonable inferences in favor of the nonmoving party, and it may not make

credibility determinations or weigh the evidence."  Kevin M. Ehringer Enters., 646

F.3d at 326 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150

(2000).  However, "[u]nsubstantiated assertions, improbable inferences, and

unsupported speculation are not sufficient to defeat a motion for summary

judgment."  United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012)

(quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

DISCUSSION

I. Defendant's Objections to Plaintiff's Evidence

 Defendant objects to various portions of Plaintiff's summary judgment

because the statements a) constitute inadmissible hearsay, b) are violative of the best

evidence rule, c) are speculative, conclusory, and not based on Straughn's personal

10

knowledge, d) come from a sham affidavit, and e) are contained within non-authenticated records. (Dkt. # 29.)  The Court addresses only those objections pertaining to summary judgment evidence relied on herein, and does so in the body of the analysis as the evidence arises.  For the reasons discussed below, the Court **GRANTS IN PART AND DENIES IN PART** TPA's Motion to Strike (Dkt. # 29).

II.     TPA's Motion for Summary Judgment

        The Court first considers the arguments in TPA's Motion for Summary Judgment.  In its motion, TPA contends that Straughn's Title VII claims fail because: (1) the claims are time-barred and there is no reason for equitable tolling; and (2) he failed to establish the fourth and fifth elements of a prima facie case for hostile work environment, specifically that the harassment was so severe and pervasive as to alter a term, condition, or privilege of Straughn's employment and that TPA failed to take prompt remedial action.  (TPA Mot. at 11–19.)  The Court considers each argument in turn.

        A.      Whether Straughn's Claims are Time-Barred

        TPA argues that Straughn's claims are time-barred because Straughn filed his civil suit over 90 days after he received the Right-to-Sue Letter.  (TPA Mot. at 11–15.)  Straughn counters he timely filed suit upon receiving the letter.  (Dkt. # 25 at 13.)  In support of his argument, Straughn contends that he did not receive the Right-to-Sue Letter until May 9, 2013, two days after his attorney was informed

11

that the case had been closed on November 30, 2012.  (Dkt. # 25, Ex. 17 at 1, 2.)

Accordingly, Straughn maintains that he did not have notice of his right to sue until

May 9, 2013 and that his August 6, 2013 filing was therefore timely.

      Title VII's statutory text requires any civil action to be brought within

ninety days of receipt of an EEOC notice of right to sue.  42 U.S.C. § 2000e-5(f)(1);

see also Harris v. Boyd Tunica, Inc., 628 F.3d 237, 239 (5th Cir. 2010) ("Section

2000e–5(f)(1) requires a civil action be commenced within ninety days after the

plaintiff has received a right-to-sue notice from the EEOC.").  As a general rule,

"the giving of notice to the claimant at the address designated by him suffices to

start the ninety-day period."  Espinoza v. Mo. Pac. R. Co., 754 F.2d 1247, 1250 (5th

Cir. 1985).

      "When the date on which a right-to-sue letter was actually received is

either unknown or disputed, courts have presumed various receipt dates ranging

from three to seven days after the letter was mailed," Taylor v. Books A Million,

Inc., 296 F.3d 376, 379 (5th Cir. 2002), "so long as there is sufficient evidence that

the letter was actually mailed." Duron v. Albertson's LLC, 560 F.3d 288, 290 (5th

Cir. 2009); see also Cargo v. Kan. City S., No. 05-2010, 2009 WL 799695, at *2

(W.D. La. Mar. 29, 2009) ("This Court has previously refused to 'accept as a matter

of certain fact that the EEOC actually mailed the notice of right to sue on [a certain

date] merely because that [wa]s the date indicated on a copy of the EEOC notice.")

12

Although the right-to-sue letter most commonly triggers the statutory time requirement, courts within the Fifth Circuit have found that any form of notice is sufficient to trigger the ninety days.  See Taylor v. Cnty. Bancshares, Inc., 325 F. Supp. 2d 755, 765–66 (E.D. Tex. 2004); Hunter-Reed v. City of Hous., 244 F. Supp. 2d 733, 742 (S.D. Tex. 2003); Thornton v. S. Cent. Bell Tel. Co., 906 F. Supp. 1110, 1117 (S.D. Miss. 1995).  Therefore, if a plaintiff receives oral notice from an EEOC officer that notice of right to sue has been issued, the ninety days will commence.  Taylor, 325 F. Supp. 2d at 765–766; Hunter-Reed, 244 F. Supp. 2d at 742.

Because the Fifth Circuit treats the ninety-day period akin to a statute of limitations, "the ninety-day filing requirement is subject to equitable tolling." Harris, 628 F.3d at 239.  The Fifth Circuit favors a case-by-case approach when examining whether equitable tolling should apply.  Harvey v. City of New Bern Police Dep't, 813 F.2d 652, 653 (4th Cir. 1987) (characterizing the Fifth Circuit's approach and citing Espinoza, 754 F.2d at 1250).  In most cases, equitable tolling is limited to circumstances where the claimant failed to receive the notice of right to sue by no fault of his own.  Espinoza, 754 F.2d at 1250.  However, the Fifth Circuit has also pointed to other non-exclusive, additional bases for equitable tolling, including: (1) when the EEOC inadequately informs the claimant of the ninety-day requirement; (2) when there is a pending motion to appoint counsel; (3) where the

13

court has led the claimant to believe that he has satisfied all requirements for filing a

civil suit; and (4) where the defendant's affirmative misconduct "lulled" the plaintiff

into inaction.  Id. at 1251.

A plaintiff's failure to receive the notice of right to sue when the letter

is addressed to an incorrect address is not reason for equitable tolling when the

plaintiff moved and did not affirmatively provide an updated address to the EEOC.

Gibson v. Methodist Hosp., 108 F.3d 333, at *1 (5th Cir. 1997); Hunter-Reed, 244

F. Supp. 2d at 743.  However, there is a basis for tolling when a plaintiff informs the

EEOC of a new address and the EEOC nevertheless mails the right-to-sue letter to

an old address.  Hunter-Reed, 244 F. Supp. 2d at 743.

In the case at hand, neither party has challenged the fact that the First

Right-to-Sue Letter was mailed on November 30, 2012—the date on which the letter

was signed.  (See Dkt. # 25 at 13; TPA Mot. at 14.)  Therefore, the Court assumes

this was the date of mailing.    However, the record is clear that the letter was not

sent to Straughn's address.  (See TPA Mot., Ex. K.[4])  Straughn's address is on

---

[4] The Court **DENIES** TPA's motion to strike Exhibit 3 of Straughn's Motion for
Summary Judgment evidence as moot.  (Dkt. # 29 at 7–8.)  TPA argues that the
evidence is an unauthenticated exhibit, since Straughn failed to submit a letter of
certification with his original Motion for Summary Judgment.  (Id.)  Although
Straughn supplemented his evidence with a statement authenticating the EEOC
records that he attached to his Response (Dkt. # 28, Ex. 1), TPA contends that,
because the supplemental materials consist of an statement that certifies that "[t]he
attached pages are true and correct copies . . ." without attaching any documents, the

"Cherisse Drive," but the letter was addressed to him at "Cherrie Drive."  (Compare Straughn Aff. ¶ 34 with TPA Mot., Ex. K.)  This error accounts for Straughn's failure to receive the letter.

TPA has produced no evidence demonstrating that Straughn actually received the letter at his Cherisse Drive address.  Instead, TPA has produced deposition testimony from Straughn, which it characterizes as an admission that Straughn received the Right-to-Sue Letter before he retained counsel in December 2012, even though the letter was addressed to him at "Cherrie Drive."  (See Dkt. # 28 at 5 (citing TPA Straughn Dep. 180:10–13).)  The full testimony on the issue reads as follows:

> 180:2 Q.   And if you turn to page Straughn 7.  That is a
>            Notice of Conciliation Failure.  Did I read that
>            correctly?
> 4     A.   Yes, sir.
> 5     Q.   Do you remember receiving that from EEOC?
> 6     A.   Yes, sir.
> 7     Q.   Do you know whether you were represented by
>            Mr. Acuna's office at the time you received that?
> 9     A.   No, sir, I wasn't.
> 10    Q.   If you turn to the next page, Straughn 8.  Do you
>            see Notice of Right to Sue?  Do you remember
>            whether you were retained by Mr. Davis' office
>            when you received this?
> 13    A.   No, sir.

---

certification is void.  (Dkt. # 33 at 4.)  For proof of the matter that the letter was sent to the wrong address, the Court relies on TPA's version of the letter, which is properly authenticated.  Therefore, the Court does not need to address whether Straughn's version of the EEOC letter is properly authenticated.

| 14 | Q. | And when you go the Determination, if you go back to Straughn 5, did you talk to anybody about this document when you received it? |
|----|----|----|
| 17 | A. | I think I talked to see if Mark can help me with it. |
| 18 | Q. | But you don't remember when? |
| 19 | A. | No, sir. |
| 20 | Q. | And do you remember if when you received it you also talked to him about – let's see, Straughn 7, Notice of Conciliation Failure? |
| 23 | A. | Yes, sir. |
| 24 | Q. | And Straughn 8? |
| 25 | A. | Yes, sir. |
| 181:1 | | (Exhibit 20 marked) |
| 2 | Q. | (BY MR. BISSMEYER) You have been handed what has been marked as Exhibit Number 20, which again is a document that was produced by your attorney in this litigation.  Have you seen this document before? |
| 6 | A. | Yes, sir. |
| 7 | Q. | And is this a copy of the agreement that was signed between you and your attorney's office? |
| 9 | A. | Yes, sir. |
| 10 | Q. | And what is the date that you signed this paper? |
| 11 | A. | November the 12th – the 30th. |
| 12 | Q. | November the 30th, 2012? |
| 13 | A. | Yes, sir. |
| 14 | Q. | So is it your recollection that at the time you spoke to Mr. Acuna's office, again not going into detail about communications, that you had talked to them about those documents we just talked about? |
| 18 | A. | Yes, sir, probably so. |

In its Motion, TPA states, "In fact, Plaintiff admits that he received a copy of the First Notice before he retained Mr. Acuna."  (TPA Mot. at 14; see also Dkt. # 28 at 4–5 ("Plaintiff admits in deposition testimony that he received a copy of the First Notice before he retained Mr. Acuna.").)  In support of the proposition,

16

TPA cites to page 180, lines 10–13 of Straughn's deposition testimony.  (TPA Mot. at 14 n.95; see also Dkt. # 28 at 5 n.21 (citing the same lines.))

A plain reading of these lines shows only that Straughn did not remember whether he was retained by Mr. Acuña's office when he received the Right-to-Sue Letter.  The only definitive statement that Straughn makes about the Right-to-Sue Letter is that he discussed it with Mr. Acuña's office when he received it; he does not address when that occurred.  (TPA Straughn Dep. 180:24–25.) Moreover, the only definitive statements that Straughn makes with regard to the timing of retaining counsel are in reference to the Determination Letter and the Notice of Conciliation, which are distinct documents that do not incorporate the Notice of Right to Sue and do not provide any notice of the ninety-day filing deadline.  (See TPA Straughn Dep. 180:2–9; TPA Mot., Ex. J, K.)

In its Motion to Strike and at the hearing, TPA also argued that lines 14–18 on page 181 of Straughn's deposition testimony establish that he received the Right-to-Sue Letter before he obtained Mr. Acuña's representation.  (Dkt. #29 at 7.) However, Straughn's language is not as conclusive as TPA suggests.  As TPA's Motion and Reply correctly argue, Straughn says only that he probably received documents before retaining Mr. Acuña.  (TPA Straughn Dep. 180:14–18.)  The documents that he refers to are generally the "documents [they] just talked about" in the preceding lines.  (Id.)  There were three documents discussed during the course

of the questioning, only one of which was the Right-to-Sue Letter.  (Id. at 180:2–

25.)  Given the ambiguity of the question and the time between the discussion of

those documents and TPA's question about timing on page 181, the Court does not

find that the testimony is conclusive enough to constitute an admittance of receipt of

the Right to Sue Letter before retaining Mr. Acuña's firm.[5]

       To the extent that TPA argues that Straughn's testimony established

that Straughn received other wrongly addressed mail to his address (see TPA Mot. at

4), the argument is unavailing.  Even if the record clearly stablished that Straughn

received those documents by mail,[6] the fact that Straughn received some incorrectly

addressed mail at his actual address does not conclusively establish that he also

received the wrongly-addressed Right-to-Sue Letter, which was mailed at a different

time.

       Finally, TPA argues that because he communicated with EEOC Officer

_____

[5] For these same reasons, the Court finds that the testimony does not conflict with
Straughn's allegations in paragraphs 32–34 of his affidavit, and therefore **DENIES**
TPA's motion to strike on that issue.  (See Dkt. # 29 at 7.)

[6] In support of this proposition, TPA also cites to Straughn's deposition testimony
that states he received a letter from Minks at the EEOC on July 5, 2012.  (Dkt. # 28
at 4.)  The testimony does not make clear whether Straughn received the letter via
mail, email, or in person.  See TPA Straughn Dep. at 182:3–182:9 (Q. (BY MR.
BISSMEYER) I am handing you what has been marked as Exhibit Number 21.  Is
this the document you remember receiving from Ms. Minks at the EEOC?  A. Yes,
sir.  Q. Do you remember at any time after you received this – and this is dated July
5, 2012; is that right?  A. Yes, sir.")

Marie Minks ("Minks") via email on several occasions, and because she regularly

sent documents to him via mail and email, Straughn probably received the Right-to-

Sue Letter from her via email. (Dkt. # 28 at 4.) While it is clear that Minks was the

EEOC investigator that handled the investigation of Straughn's First Charge, it is

not clear that she would have been the officer to communicate the ultimate notice of

Straughn's right to sue. (See TPA Mot., Ex. K (listing Jose Colon-Franqui as the

EEOC Representative on the Notice of Right to Sue).) Evidence that Straughn and

Minks sometimes exchanged documents via email is insufficient to establish that

Straughn had actual notice of the Right-to-Sue Letter in November 2012.

      Because the letter was mailed to the wrong address and there is no

concrete evidence that Straughn was put on actual notice of the decision by some

other means, the ninety-day period did not begin until he received the letter on May

9, 2013. See Price v. Choctaw Glove & Safety Co., 459 F.3d 595, 597 n.1 (5th Cir.

2006) ("The EEOC issued [plaintiff] a Notice of Right to Sue letter on November

25, 2002, but the letter was mailed to the wrong address. This error was corrected

by a second letter sent to Price on February 2, 2003. Therefore Price's 90-day time

limit to file her claims under Title VIII began on February 7, 2003."); see also

Brown v. Eaton Corp., No. 3:10-cv-175, 2011 WL 338444, at *3 (S.D. Miss. Jan.

313, 2011) (denying summary judgment on timeliness because there was evidence

that plaintiff never received a copy of the right-to-sue letter, despite his attempts to

19

follow-up with the EEOC); <u>Pena v. Stewart Title Co.</u>, No. 06-3003, 2007 WL

2903844 (S.D. Tex. Oct. 3, 2007) (denying summary judgment on timeliness

because the Defendant failed to show conclusively when the right-to-sue letter was

mailed to the correct address); <u>Taylor</u>, 325 F. Supp. 2d at 765 (denying summary

judgment on timeliness because there was no evidence that plaintiff received notice

of the May 15, 2002 right-to-sue letter by mail and she did not have actual notice

from an EEOC officer until November 18, 2002).

Straughn filed his case on August 6, 2013, eighty-nine days after

receiving the Right-to-Sue Letter on May 9, 2013.  (Dkt. # 1; Straughn Aff. ¶ 34;

Dkt. # 25, Ex. 17 at 12.[7])  Therefore, his claims are timely and summary judgment is

denied on this issue.

Moreover, even if the Court were to find that the ninety-day period did

commence on November 30, 2012, equitable tolling would be appropriate in this

case.  Straughn has presented evidence that his failure to receive notice was no fault

_____

[7] TPA challenges the EEOC letter with the May 9, 2013 date stamp, contained in
Straughn's Exhibit 17, as not properly authenticated.  (Dkt. # 29 at 7–8.)  TPA
argues that the evidence is an unauthenticated exhibit, since Straughn failed to
submit a letter of certification from the EEOC with his original Motion for
Summary Judgment.  (<u>Id.</u>)  However, in conjunction with the letter, Straughn
provided an affidavit from Kathleen Miele, paralegal at the Davis Law Firm
representing Straughn, which certifies that the letter provided is the letter that
Straughn delivered to her in the office on May 9, 2013, following her conversation
with the EEOC, during which she requested a copy of the letter.  This is sufficient to
authenticate the letter for the purposes of showing that it was received on May 9,
2013.  Therefore, TPA's motion to strike the letter (Ex. 17 at 12) is **DENIED**.

of his own: there was an error in the EEOC's record of Straughn's address.

Defendant has produced no evidence demonstrating that Straughn affirmatively

provided the EEOC with the incorrect address.  The only evidence in the record—

which Defendant does not point to—is the First Charge, which Straughn signed,

listing Straughn's mailing address as "Cherrie" Drive.  (TPA Mot., Ex. F.)  This is a

reasonable mistake, and one that the Court finds distinguishable from the types of

affirmative mistakes that preclude equitable tolling.  See, e.g., Thomas v. Dalton's

Club Mktg. Servs., Inc., at *3 (N.D. Tex. Dec. 10, 2004) (rejecting equitable tolling

where plaintiff failed to inform EEOC of her change of address even when she filled

out the USPS paperwork to have her mail forwarded); Smith v. Distrib. Operations,

Inc., No. 02-0439, 2002 WL 1379185, at *2 (E.D. La. June 25, 2002) (rejecting

equitable tolling where plaintiff failed to inform EEOC of his change of address one

day after he signed a statement promising to advise the agency of any updated

addresses); Anyanwu v. NCH Corp., No. 3:97-cv-2892, 1998 WL 920327, at * 4

(N.D. Tex. Dec. 29, 1998) (rejecting equitable tolling where plaintiff failed to

inform EEOC of his change of address and where plaintiff had oral notice of his

right to file suit from his EEOC officer); Crittendon v. Am. Nat. Ins. Co., 967 F.

Supp. 933, 943 (S.D. Tex. 1997) (rejecting equitable tolling where plaintiff failed to

inform EEOC of her change of address, even when plaintiff had a spoken agreement

with an EEOC representative that she would receive a call whenever she was mailed

21

an important document).  Therefore, even if the ninety-day period did begin to run when the letter was sent on November 30, 2012, equitable tolling until Straughn received the letter on May 9, 2013, is appropriate and precludes summary judgment on the timeliness issue.

      B.    <u>Failure to Promote Claim</u>

         TPA next argues that summary judgment dismissing Straughn's failure to promote claim should be granted because (1) Straughn did not allege any facts or claims related to TPA's failure to promote him, in violation of the Fifth Circuit's requirements that the grounds of a Title VII claim be raised during the EEOC process; and (2) the failure to promote claim arises from discrete acts for which Straughn failed to bring an independent EEOC claim within 300 days.  (Dkt. # 23 at 11–13.)  Straughn contends that his failure to promote claims were within the scope of the EEOC investigation that could have reasonably grown out of his administrative charge, and were therefore properly exhausted through the administrative process.  (Dkt # 25 at 10–13.)

         Because Title VII plaintiffs must exhaust their administrative remedies through the EEOC prior to filing civil suit, <u>Taylor</u>, 296 F.3d at 378–79, a court's ability to consider claims beyond those raised in the EEOC charge is somewhat circumscribed.  <u>See</u> <u>Fine v. GAF Chem. Corp.</u>, 995 F.2d 576, 577–78 (5th Cir. 1993).  If a plaintiff raises claims beyond those alleged in the EEOC charge, "the

scope of a Title VII suit [can] extend as far as, but no further than, the scope of the EEOC investigation which could reasonably grow out of the administrative charge." Id. at 578.

The purpose of this rule is to "protect[] unlettered lay persons making complaints without legal training or the assistance of counsel." Id.  Therefore, "the crucial element of a charge of discrimination is the factual statement contained therein," rather than the "legal conclusion to the facts alleged." Sanchez v. Standard Brands, Inc., 431 F.2d 455, 462 (5th Cir. 1970); see also Price v. Sw. Bell Tel. Co., 687 F.2d 74, 78 (5th Cir. 1982) (citing Sanchez, 431 F.2d at 462).  Accordingly, if a plaintiff alleges facts sufficient to make out a claim, his failure to select the correct type of discrimination on the charging form is inapposite to the analysis. Sanchez, 431 F.2d at 462.

In Straughn's June 20, 2012 EEOC charge, he alleges the following facts: (1) "Since October 2011, [he] ha[s] been subjected to racist and offensive behavior while at work; (2) his coworker called him a "nigger" and threatened to kill him and other black employees; (3) another coworker made a noose and hung it up at his worksite; and (4) he observed two incidents of racist graffiti in the bathrooms. (TPA Mot., Ex. F.)  None of these facts could form the basis of a legal claim for failure to promote.  Nevertheless, Straughn argues that the Court should construe the EEOC charge to include these claims because the failure to promote claims could

23

have reasonably grown out of the "pattern of racially discriminatory behavior and threats of racial violence towards black employees."  (Dkt. # 25 at 12.)

There is no indication that Straughn's failure to promote claim would have reasonably grown out of the EEOC's investigation.  As the EEOC's Determination Letter makes clear, the scope of the EEOC investigation involved racial harassment that arose from evidence of repeated and derogatory racial comments, graffiti, and threats of violence.  (TPA Mot., Ex. J.)  The determination letter makes no mention of any investigation related to TPA's hiring or promotion practices, either generally or specifically to Straughn.  Nor does the Court have reason to believe that Straughn could not have addressed the facts related to failure to promote in his charge.  See Waters v. City of Dall., No. 3:11-CV-0540-K, 2012 WL 5363426, at *5 (N.D. Tex. Nov. 1, 2012) (finding that the plaintiff failed to exhaust his claims when he omitted all allegations of discrimination from a certain period from his EEOC charge, when timing was such that he could have included those allegations in his charge), aff'd, 540 F. App'x 257 (5th Cir. 2013).  Straughn's allegations implicate conduct that began in October 2011 and continued through the charge's filing date in June 2012, but Straughn fails to identify any failure to promote during that time.  Given the separate nature of the facts giving rise to a hostile work environment and failure to promote claim, Straughn's failure to promote claims could not reasonably be expected to be within the scope of the

EEOC investigation.  See Fine, 995 F.2d at 578 (finding that the plaintiff's October

and November 1990 failure to promote claims were not within the scope of the

EEOC investigation, where the charge alleged failure to promote in February 1990

and was filed in November 1990).

      Straughn argues that he informed the EEOC Officer, while she was

investigating his case, that he had applied for the leadman position on more than one

occasion but was never promoted.  (TPA Straughn Aff. ¶ 26.[8])  Although the "actual

scope of the EEOC's investigation . . . [is] pertinent to an exhaustion inquiry," the

mere fact that Straughn mentioned the issue to Minks is not enough.  Without any

other facts in the record showing that the EEOC investigation actually blossomed

into an investigation of Straughn's failure to promote claims, the Court finds that the

matter was not exhausted through the EEOC process and is therefore barred.

Accordingly, the Court **GRANTS** TPA's Motion for Summary Judgment on the

Failure to Promote Claim.

---

[8] The Court **DENIES** TPA's motion to strike this evidence.  (Dkt. # 29 ¶ P.)  TPA
argues that the evidence constitutes inadmissible hearsay and is violative of the best
evidence rule.  Although Straughn's recitation of Minks's question may constitute
hearsay, his response to her questions is admissible as his own testimony.
Moreover, Straughn's testimony does not violate the best evidence rule because he
does not seek to prove terms of Minks's investigation notes, but rather provides his
personal knowledge about the investigation.  See Kiva Kitchen & Bath Inc. v.
Capital Distrib. Inc., 319 F. App'x 316, 322 (5th Cir. 2009) ("the best evidence rule
'comes into play only when the terms of a writing are being established,' not when a
witness's testimony is based on personal knowledge." (quoting In re Mobilift Equip.
of Fla., Inc., 415 F.2d 841, 844 (5th Cir. 1969)).

C.      Hostile Work Environment Claim

Additionally, TPA contends that summary judgment on Straughn's

hostile work environment claim is warranted because Straughn failed to make out

his prima facie case.  (TPA Mot. at 15.)  Specifically, TPA argues that the facts are

insufficient to show (1) that the harassment was so severe and pervasive as to alter a

term, condition, or privilege of employment, or (2) that TPA failed to take remedial

measures. (Id. at 15, 18.)

To demonstrate a prima facie case based on race discrimination

creating a hostile work environment, a plaintiff has the burden to show that he "(1)

belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the

harassment complained of was based on [race]; (4) the harassment complained of

affected a term condition, or privilege of employment; [and] (5) the employer knew

or should have known of the harassment in question and failed to take prompt

remedial action."  Royal v. CCC & R Tres Arboles, L.L.C., 736 F.3d 396, 401 (5th

Cir. 2013) (citing Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 651 (5th Cir.

2012)).  Since neither party contests that Straughn has met his burden on the first

three elements, the Court addresses the fourth and fifth elements in turn.

1.      Term, Condition, or Privilege of Employment

"Harassment affects a 'term, condition, or privilege of employment' if

it is 'sufficiently severe or pervasive to alter the conditions of the victim's

26

employment and create an abusive working environment.'"  Hernandez, 670 F.3d at

651 (quoting Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir. 2002)).

      "Conduct must be extreme to amount to a change in the terms and

conditions of employment."  Faragher v. City of Boca Raton, 524 U.S. 775, 788

(1998).  "Simple teasing, offhand comments, and isolated incidents (unless

extremely serious) will not amount to discriminatory changes in the 'terms and

conditions of employment.'"  Hockman v. Westward Commc'ns, LLC, 407 F.3d

317, 328 (5th Cir. 2004) (quoting Faragher, 524 U.S. at 788.  However, "isolated

incidents, if egregious, can alter the terms and conditions of employment."  Harvill

v. Westward Commc'ns, L.L.C., 433 F.3d 428 (5th Cir. 2005) (quoting Faragher,

524 U.S. at 788.  As the Supreme Court has made clear:

> These standards for judging hostility are sufficiently demanding
> to ensure that Title VII does not become a general civility code.
> Properly applied, they will filter out complaints attacking the
> ordinary tribulations of the workplace, such as the sporadic use
> of abusive language, gender-related jokes, and occasional
> teasing.

      Additionally, the environment must be "both objectively and

subjectively offensive, one that a reasonable person would find hostile or abusive,

and one that the victim did in fact perceive to be so."  Aryain v. Wal-Mart Stores of

Tex., LP, 534 F.3d 473, 479 (5th Cir. 2008).  In determining whether the working

environment is sufficiently abusive or hostile, courts must look to the totality of the

circumstances, including (1) the frequency of the conduct, (2) its severity, (3)

"whether it is physically threatening or humiliating, or a mere offensive utterance",

and (4) "whether it unreasonably interferes with an employee's work performance."

Royal, 736 F.3d at 401 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23

(1993)).

      In Walker v. Thompson, 214 F.3d 615 (5th Cir. 2000), abrogated on

other grounds by Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68

(2006), the Fifth Circuit found that there was a fact issue as to whether the

harassment was severe or pervasive enough to create a hostile work environment

when, over a period of three years, the plaintiffs were subject to "comparisons to

slaves and monkeys, derisive remarks regarding their African heritage, patently

offensive remarks regarding the hair of African-Americans, and conversations in

which a co-worker and supervisor used the word nigger."  Id. at 626.  The Court

found it significant that "[t]he office manager [] informed [the plaintiffs] that the

vice-president did not want the African-American women to talk to each other" and

that a non-party to the suit resigned because "she could no longer tolerate the racism

and discrimination."  Id.

      In Bell v. Ingalls Shipbuilding, Inc., 207 F.3d 657 (5th Cir. 2000), the

Fifth Circuit found that there were fact issues as to whether the workplace at issue

was racially hostile, given the "frequent making of nooses, coupled with the

presence of allegedly offensive racial remarks and the presence of KKK graffiti at

the worksite."  Id. at *1.  Again in Abner v. Kan. City So. R. Co., 513 F.3d 154 (5th

Cir. 2008), the Fifth Circuit found that evidence of wires in the shape of nooses

placed at the worksite, as well as graffiti and racially derogatory language over a ten

year period, was sufficient to create a fact issue on the hostile work environment

claim.  Id. at 167–168, 167 n.70.

Straughn alleges that within three days of his first day of work at TPA,

he was addressed as "nigger" (TPA Straughn Dep. 150:5–16); that one or two weeks

later, a co-worker hung a noose in the work area, pointed out the noose, and said

that it was "where [they] hang niggers at" (id. at 151:20–152:8); that a few months

later, a co-worker angrily told him "I will fucking kill you you nigger you ain't shit"

(id. at 154:17–18, 155:10–11; Straughn Aff. ¶ 12[9]); that on at least six occasions

thereafter, he was called "nigger" in retaliation for reporting the incident (TPA

_____

[9] The Court notes that TPA has withdrawn its hearsay objection to this evidence. (See Dkt. # 33 at 2 (withdrawing hearsay objection in paragraph E of the Motion to Strike).)  TPA also argues that this portion of Straughn's affidavit conflicts with his deposition testimony, rendering his affidavit a sham affidavit.  The Court disagrees. The relevant portion of the affidavit states: "When Jason saw that I had moved the box he appeared to become very angry.  Jason said 'You ain't shit, you are Ellis' bitch.'"  In his deposition testimony, Straughn describes the event.  (TPA Straughn Dep. 154:15–156:03.)  Although Straughn does not quote Jason's comments, he describes them in broad generalities that are consistent with the statement in his affidavit.  The court finds no direct conflict between the affidavit and deposition testimony indicating bad faith, see Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 349 (5th Cir. 2007), and striking the affidavit is therefore unwarranted.  The Court accordingly **DENIES** the motion to strike on that basis.

Straughn Dep. 156:7–157:1; Straughn Aff. ¶ 15[10]); and that over the year and half from the time he was hired until the filing of his charge, he observed at least thirteen instances of racist language, including the word "KKK," the phrase "I do not like Blacks," a Nazi symbol, and other racist phrases—at least eight of which were directed specifically at Straughn (TPA Straughn Dep. 166:8–168:9, 174:14–22, 175:4–13, 175:16–22, 176:12–14)—and was denied promotions twice (id. at 190:8–191:5.).

Although infrequent instances of racial slurs are not sufficient to give rise to a hostile work environment claim, a combination of racial epithets, racially-charged graffiti, and physical threats over a relatively short time are sufficient to raise a fact question on the issue. Moreover, as this Court has stated previously, "It goes without saying that nooses are symbols of racial hate, reminders of a not-so-distant time when vigilantes and mobs lynched African-Americans. . . Accordingly, harassment involving nooses is particularly severe and especially harmful." Fennell v. Marion Indep. Sch. Dist., 963 F. Supp. 2d 623, 645 (W.D. Tex. 2013) (citing Bell, 207 F.3d 657, at *1 (noting that nooses "evoke[] the image of race-motivated lynching")). Therefore, the Court finds that Straughn has presented sufficient evidence to meet his burden on the fourth element of his hostile work

---

[10] The Court notes that TPA has withdrawn its objection to this evidence. (See Dkt. # 33 at 2 (withdrawing hearsay and additional objections in paragraph H of the Motion to Strike).)

environment claim.

      2.     <u>Notice and Remedial Measures</u>

Plaintiff alleges the following facts show that TPA knew of the harassment and failed to take proper remedial measures: (1) when he notified his group leader, Patrick, about the Noose Incident, Patrick did not raise the issue with Human Resources and instead asked the parties involved how they wanted to handle the situation (TPA Straughn Dep. 152:14–153:5); (2) TPA failed to take any action in response to the Garcia Incident until Straughn made a complaint to Burrell that Garcia was still on the job (TPA Straughn Aff. ¶ 13[11]); (3) the only response to the graffiti, apart from painting over the graffiti when it was reported, was an announcement that employees needed to respect each other (Dkt. # 25, Ex. 6 at 1[12]); (4) there was little to no training on discrimination prior to the June 20, 2012 EEOC

---

[11] Because the Court does not find the evidence related to Burrell's testimony relevant to deciding the issue, <u>see</u> <u>infra</u> at Section II.C.2.a, it **DENIES** TPA's objection to this part of Straughn's evidence set forth in his affidavit as **MOOT**. (<u>See</u> Dkt. # 29 at 2.)

[12] TPA argues that this evidence must be stricken because it is an EEOC record that was not accompanied by a declaration from the EEOC attesting to its accuracy. However, Straughn subsequently filed a letter from the EEOC attesting to the accuracy of the evidence as a final exhibit to his Motion for Summary Judgment. (Dkt. # 30.)  Although Plaintiff did not duplicate the pages already provided when submitting the authentication letter, the Court finds that the letter properly authenticated the EEOC documents that Plaintiff previously attached to the summary judgment motion.  Accordingly, TPA's motion to strike this evidence is **DENIED**.

Charge (TPA Straughn Aff. ¶ 37;[13] Dkt. # 25, Ex. 15[14]); and (5) TPA's "'plan' to address harassment was 'trickle down' training in which each manager would received [sic] an hour of training and then present the training to the employees in 'bite-sized' training and that after the training, there would be a quiz" (Dkt. # 25, Ex. 6 at 2[15]).

"A title VII employer has actual knowledge of harassment that is known to 'higher management' or to someone who has the power to take action to remedy the problem." Sharp v. City of Houston, 164 F.3d 923, 929 (5th Cir. 1999).

---

[13] Straughn's affidavit states, "While I was at Texas Powertrain we received no training on anti-discrimination policies." (TPA Straughn Aff. ¶ 37.) TPA argues that, to the extent Straughn's statement testifies to the training that other employees received, that statement is beyond his personal knowledge and is therefore inadmissible. (Dkt. # 29 at 5.) The Court agrees that, while Straughn can attest to the training that he received, he cannot attest to the training that other employees received, as that information is not within his personal knowledge. Therefore, the Court **GRANTS** TPA's request to strike Straughn's statement to the extent that it refers to training received by other employees. However, the Court **DENIES** TPA's request to strike the statement in its entirety, since Straughn's testimony about his own training is admissible.

[14] TPA argues that this evidence must be stricken because it is an EEOC record that was not accompanied by a declaration from the EEOC attesting to its accuracy. For the reasons discussed at supra note 12, the Court **DENIES** TPA's motion to strike this evidence.

[15] TPA argues that this evidence must be stricken because it is an EEOC record that was not accompanied by a declaration from the EEOC attesting to its accuracy. For the reasons discussed at supra note 12, the Court **DENIES** TPA's motion to strike this evidence.

Under this standard, a manager[16] is a person that can hire or fire the offending

employee, take disciplinary action, provide "significant input" into employment

decisions, direct the harassing employee to stop his behavior, or implement other

remedial action.  Id.  Alternatively, an employer has constructive notice of

harassment when "the harassment complained of is so open and pervasive that the

employer should have known of it, had it but opened its corporate eyes."  Id.

    "'Prompt remedial' action must be 'reasonably calculated' to end the

harassment."  Skidmore v. Precision Printing and Packaging, Inc., 188 F.3d 606,

---

[16] Although the parties provided briefing related to the definition of "supervisor"
under Vance v. Ball State Univ., 133 S. Ct. 2434 (2013), that definition is
inapplicable here.  Vance's definition of supervisor is limited to the Ellerth/Faragher
defense, which is only relevant when a supervisor is the perpetrator of the
harassment.  Id. at 2443 ("We hold that an employer may be vicariously liable for an
employee's unlawful harassment only when the employer has empowered that
employee to take tangible employment actions against the victim . . . .").
    "Under Title VII, an employer's liability for workplace harassment
depends on the status of the harasser" as a coworker or a supervisor.  E.E.O.C. v.
Boh Bros. Constr. Co., 731 F.3d 444, 452 (5th Cir. 2013).  As the Fifth Circuit
explained:

> If the harassing employee is the victim's co-worker, the
> employer is liable only if it was negligent in controlling
> working conditions.  In cases in which the harasser is a
> supervisor, however, different rules apply. . . .[I]f no tangible
> employment action is taken the employer may escape liability
> by establishing, as an affirmative defense, that (1) the employer
> exercised reasonable care to prevent and correct any harassing
> behavior and (2) that the plaintiff unreasonably failed to take
> advantage of the preventative or corrective opportunities that
> the employer provided.

Id.  Because the harassment at issue occurred at the hands of a coworker—Rangel—
reliance on the definition of a supervisor under Vance is misplaced.

615 (5th Cir.1999) (quoting <u>Jones</u>, 793 F.2d at 719–20).  "Whether an employer's

response to discriminatory conduct is sufficient will necessarily depend on the

particular facts of the case—the severity and persistence of the harassment, and the

effectiveness of any initial remedial steps."   <u>Hirras v. Nat'l R.R. Passenger Corp.</u>,

95 F.3d 396, 399–400 (5th Cir. 1996) (internal quotation marks omitted).  To meet

the burden on this prong, a plaintiff must show that he "[took] advantage of

corrective opportunities provided by the employer."  <u>May v. Fedex Freight E., Inc.</u>,

374 F. App'x 510, 512 (5th Cir. 2010) (quoting <u>Harvill</u>, 433 F.3d at 437) (finding

that where plaintiff signed a statement agreeing to report any acts of harassment to a

particular person and that, upon making a report to that person, the company took

prompt remedial measures, the plaintiff did not make out the fifth element of her

prima facie case).

a.    <u>The Noose Incident</u>

Straughn argues that TPA became aware of the Noose Incident when

Straughn reported the conduct to Patrick and Burrell.  (<u>See</u> Dkt # 25 at 18.)  He

further contends that the response—Patrick's decision not to independently report

the incident to Human Resources and instead allow the employees involved to make

the decision—was an insufficient remedial measure.  (<u>See</u> <u>id.</u>)

TPA counters that it did not receive notice the Noose Incident until it

received the First Charge on Thursday, July 12, and upon receiving the charge,

34

Human Resources launched an investigation.  (Dkt. # 23, Ex. A at 5.)  TPA further alleges that after interviewing Patrick, Human Resources learned that the incident, at least in some form, occurred, but that Patrick did not report it.  (Id.)  TPA contends that Human Resources' decisions to counsel Patrick about the proper reporting of future incidents and to remind all TPA supervisors of this requirement were sufficient remedial measures, since Human Resources was unable to locate any witnesses to confirm that the events occurred.  (Id.)

Under the Fifth Circuit's interpretation of notice in this context, the central issue is whether Patrick and Burrell were part of TPA's higher management. At the time of the incident, Burrell served as an Area Manager and Patrick served as a group leader.  (Cat. Mot., Ex. G at 14:12, 21:16–17; Dkt. # 39, Ex. A at 14:12, 21:16–17.)

Although the record indicates that TPA's external hiring was done by an outside company and firing was done by Human Resources (TPA Patrick Dep. 9:6–10), the record is clear that (1) both the Area Manager and group leaders were involved in internal hiring for promotions and (2) group leaders documented infractions and issued performance evaluations.  (Id.; Dkt. # 39, Ex. A at 20:18– 22:25; Santos Dep. 8:23–25.)  As the record describes:

> Q.  Okay.  To your knowledge, what is the process of applying
> for a leadman position?
> A.  From Texas Powertrain?

35

Q.  Yes.

A.  Okay.  From what I recall, the job posting would go up.
There would be a form that would ask some questions about the
position they're applying for to gauge their experience.  It asked
them to attach a resume to that.  And then they would go
through the Human Resources department where they would
filter through applicants based off their ability to do the job,
their attendance, how well their attendance was, and if they had
any issues with their previous reviews.  And then those
applicants would be filtered out to the hiring manager, who
would be the area manager for Texas Power Systems, and that
individual would interview the team lead.  Sometimes a section
manager – or I'm sorry – the team lead – or the group lead in
that scenario would also be involved, depending upon the
position. . . .

Q.  So, just to make sure that I understand your testimony, at
some point potentially the group leader could be involved in the
process of selecting the leadman?

A.  That's correct.

Q.  Okay.  So would the area manager just sort down the
candidates and then come to you to pick who you wanted, or
how would it work?

A.  If I recall correctly, the group manager was the ultimate
decider on who was hired as team lead.  Certain jobs – certain
jobs that created like some sort of technical ability, the group –
the area manager would rely on the group leader's thoughts
about who would be the best fit for the position.

Q.  Okay.  So did Mr. Burrell ever bring you Rodney's name as
a potential candidate?

A.  No.

Q.  So then, based on your understanding of the system,
Rodney wasn't making it past that sort of clearance point.

A.  That's correct.

Q.  Okay.  Who – Whose names did Mr. Burrell bring you for
the leadman positions?

A.  I – At my time with TPS, I already had team leads.  So I
never hired a team lead.  I only hired clerks, receiving clerks.

(Dkt. # 39, Ex. A at 20:18–22:25; Cat. Mot., Ex. G at 20:18–23:1.)  The evidence

indicates that (1) Burrell had the ability to hire; (2) Patrick was able to provide significant input into employment decisions through his involvement in the internal hiring process; and (3) Patrick was able to take disciplinary action through performance evaluations and documentation of infractions. Therefore, there is a fact question as to whether Burrell and Patrick were upper management, and whether Straughn's report to them was sufficient to put TPA on notice of harassment.

If Straughn's report to Burrell and Patrick was sufficient to put TPA on notice of the harassment, TPA's remedial measures were neither proper nor prompt, viewing the facts in the light most favorable to Straughn. Neither Burrell nor Patrick reported the incident to Human Resources. Instead, Patrick asked the parties involved how they wanted to resolve the situation—pressuring Straughn to drop the issue because it would likely cause Rangel's termination. (TPA Straughn Dep. 152:14–153:5.) However, if Straughn's report to Burrell and Patrick was insufficient to put TPA on notice of the harassment, TPA would have first received notice at the time of the EEOC charge. In that case, TPA's remedial measures would have been both proper and prompt: TPA launched the investigation the day after receiving the EEOC charges, counseled Patrick about how to handle harassment issues in the future, and noticed all supervisors about proper handling of harassment claims.

Therefore, the Court concludes that there is a fact question as to

whether the remedial measures taken by TPA were prompt and reasonably calculated to end the harassment at the time TPA knew of the harassment.

### b.   The Garcia Incident

Straughn alleges that TPA's remedial action following the Garcia incident was not prompt because "[i]t was not until [he] returned to work the next day and went to Ron Burrell to express his dissatisfaction that Garcia was still on the job that Defendant took any action." (Dkt. # 25 at 18.)  Although these facts are contested, the Court must take the evidence in the light most favorable to the plaintiff.

However, Straughn makes no allegation that he reported the incident prior to when approached Ron Burrell the following day.  Even if TPA should have known that the conduct occurred because of the public nature of the event on the date of the incident (see Santos Dep. at 12:16–14:2), it is undisputed that TPA launched an investigation the next day that resulted in Garcia's termination the same day.  Even assuming a day-long delay between the remedial measure—the termination—and the incident, the Court finds that TPA acted promptly and that the remedial measure was appropriate.

### c.   Graffiti Incidents

Straughn also argues that TPA's response to the graffiti incidents was insufficient because it involved only one announcement that the employees needed

to respect each other after the second incidence of restroom graffiti.  The record also establishes that TPA painted over or removed at least some incidences of graffiti. (See TPA Straughn Dep. 167:7–168:9, 175:11–13.)  However, the record also establishes that the incidents persisted over a period of time in various forms, including graffiti in bathrooms, graffiti on fans, graffiti on Straughn's forklift, and remarks written on Straughn's sign-in sheets, despite the repeated removal of the remarks.  (Id.; see also id. at 176:3–18.)

Given the persistence of the racially-charged graffiti and writing over a period of time, the Court concludes that there is a fact question as to whether the remedial measures taken by TPA, although prompt, were reasonably calculated to end the harassment.

Accordingly, the Court finds that summary judgment on the hostile work environment claim is not warranted.  Therefore, the Court **DENIES** TPA's Motion for Summary Judgment with respect to the hostile work environment claim.

III.    Caterpillar's Motion for Summary Judgment

The Court next considers the arguments in Caterpillar's Motion for Summary Judgment.  In its motion, Caterpillar contends that Straughn's Title VII claims fail because: (1) Straughn failed to demonstrate a prima facie case of hostile work environment; (2) his failure to promote claim is barred because it was not raised in the EEOC charge; (3) he failed to establish a prima facie case of failure to

39

promote; (4) his retaliation claim is barred because it was not raised in the EEOC charge; and (5) he failed to establish a prima facie case of retaliation.  (Cat. Mot. at 3–13.)  The Court considers each argument in turn.

A.   Hostile Work Environment Claim

As discussed above, to make out a prima facie case based on race discrimination creating a hostile work environment claim, a plaintiff has the burden to show that he "(1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on [race]; (4) the harassment complained of affected a term, condition, or privilege of employment; [and] (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action."  Royal, 736 F.3d at 401 (citing Hernandez, 670 F.3d at 651).  Since neither party contests that Straughn has met his burden on the first three elements, the Court addresses the fourth and fifth elements.

1.   Prompt Remedial Action

In support of his hostile work environment claim, Straughn alleges the following facts: (1) Medina called him a "bitch ass nigga" as he was passing by; (2) another co-worker told Straughn that Medina was trying to get him fired; (3) there was racially-hostile graffiti in the women's bathroom that read "I hate Black nigger monkeys, ha ha," "KKK," and "kill all niggers"; and (4) sometime during 2013, an employee said "We don't like Blacks" and made threats that he would kill black

employees.

Even if these facts were sufficient to meet the fourth prong of the prima

facie case,[17] Straughn has not met his burden to show that Caterpillar failed to take

appropriate remedial action.  Within two days of Straughn's report of Medina's

conduct, two of Caterpillar's Human Resources employees from outside the Seguin

plant conducted an investigation into the incident.  To prevent future conflict

between Medina and Straughn, Caterpillar arranged its work teams so that Straughn

---

[17] Caterpillar argues that Straughn failed to show that the discrimination alleged was so severe and pervasive as to create a hostile work environment.  Straughn counters that the conduct alleged—that his coworker Medina called him a "bitch ass nigga" and another coworker informed Straughn that Medina was trying to get Straughn fired—occurred against a racially hostile backdrop that included racially-charged graffiti in the women's restroom.  (Dkt # 26 at 13.)

Case law is clear that an isolated incident in which a plaintiff called a "nigger," though unquestionably offensive, does not render a work environment racially hostile on its own.  See Adams v. B & B Rests., Inc., No. 07-1352, 2008 WL 4155458, at *4 (S.D. Tex. 2008); Jones v. Cont'l Cuisine, Inc., 353 F. Supp. 2d 716, 720–21 (E.D. La. 2004); see also Hernandez, 670 F.3d at 652 (finding that the plaintiff's four encounters with racial slurs over more than a decade of employment was not enough to be severe or pervasive).  The conduct alleged—namely, Medina's comment, the supposition that Medina was trying to get Straughn fired, and the graffiti—does not appear to rise to the level of severity required to make out a hostile work environment claim.

Straughn argues that the racially-charged atmosphere persisted through the change in management from TPA to Caterpillar, since almost all of the same employees were kept on, and that the conduct should be considered against that backdrop.  There may be some question as to how much a jury may be able to consider whether TPA's racially-charged atmosphere can influence the evaluation of a hostile work environment at Caterpillar.  Nonetheless, because Court finds that Straughn did not make out the fifth element of his claim, it does not reach this question.

worked with team leads other than Medina.  (Cat. Straughn Dep. 87:1–6.)  This was

a prompt and appropriate response: Caterpillar was not obligated to terminate

Medina for his comment.  See Waymire v. Harris Cnty., Tex., 86 F.3d 424, 429 (5th

Cir. 1996) ("Title VII does not require that an employer use the most serious

sanction available to punish an offender, particularly where . . . [the incident] was

the first documented offense by [the] individual employee.").

       Similarly, within a half hour of Straughn's observation of the

racially-charged graffiti, it was removed, and no other graffiti appeared thereafter.

(Cat. Straughn Dep. 55:12–14, 169:9–13.)  Finally, Straughn testified that the

employee he heard about making threats was terminated for those comments.  (Id. at

60:13–61:5.)  This response constitutes prompt remedial action, and therefore

Straughn fails to demonstrate a prima facie case of hostile work environment against

Caterpillar.  The Court therefore **GRANTS** Caterpillar's Motion for Summary

Judgment on the hostile work environment claim.

       B.    Failure to Promote Claim

       Caterpillar argues for summary judgment against Straughn on the

failure to promote claim for three reasons: (1) that the claim is barred because it was

not brought as part of his EEOC charge; (2) that the claim is barred because

Straughn failed to make out the second element of his prima facie case; and (3) even

if he did, Caterpillar has offered a legitimate, non-discriminatory reason for failing

to promote Straughn, which Straughn has not rebutted.  (Dkt. # 22.)  The Court addresses each argument in turn.

1.     <u>Whether Straughn's Claim is Barred</u>

As discussed above, if a plaintiff raises claims beyond those alleged in the EEOC charge, "the scope of a Title VII suit [can] extend as far as, but no further than, the scope of the EEOC investigation which could reasonably grow out of the administrative charge."  <u>Fine</u>, 995 F.2d at 578.  Therefore, "the crucial element of a charge of discrimination is the factual statement contained therein," rather than the "legal conclusion to the facts alleged."  <u>Sanchez v</u>, 431 F.2d at 462; <u>see also</u> <u>Price</u>, 687 F.2d at 78 (citing to <u>Sanchez</u>).

Like his June 2012 EEOC Charge, Straughn's May 17, 2013 EEOC Charge does not include any factual allegations that allege a failure to promote.  His factual allegations are that (1) he was called a racial epithet, and (2) the company was looking for a reason to fire him.  (Dkt. # 22, Ex. C at 4.)  Again, Straughn could have included his failure to promote claim in that charge, but he elected not to do so.  Because of the separate nature of the charges alleged and the failure to promote claim, Straughn's claim is barred as not properly exhausted through the EEOC process.  <u>See</u> <u>Fine</u>, 995 F.2d at 578.

2.     <u>Whether Straughn's Claim Could Succeed on the Merits</u>

Even if Straughn's failure to promote claim were not barred by his

43

failure to exhaust, his claim would nevertheless fail on the merits. To make out a prima facie case of failure to promote, a plaintiff must show "(1) that the employee is a member of the protected class; (2) that he sought and was qualified for the position; (3) that he was rejected or the position; and (4) that the employer continued to seek or promoted applicants with the plaintiff's qualifications." <u>Davis v. Dall. Area Rapid Transit</u>, 383 F.3d 309, 317 (5th Cir. 2004). If a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the plaintiff's rejection. <u>Perez v. Region 20 Educ. Serv. Ctr.</u>, 307 F.3d 318, 324 (5th Cir. 2002). If the employer articulates a reason, the burden then shifts back to the plaintiff to show that the reason offered is a pretext for discrimination. <u>Id.</u>

Caterpillar contends that Straughn failed to set forth evidence of the second element of a prima facie case because there is no record that he applied for the position and that his testimony that he submitted a paper application is not credible because Caterpillar runs its application process online. (Cat. Mot., at 11; <u>id.</u> at Ex. 1 at 10). However, at the summary judgment phase, the Court is obligated to view the evidence in the light most favorable to the plaintiff. Straughn has presented evidence that he submitted an application and was not selected for a promotion to team leader. (Cat. Straughn Dep. at 28:21–22.) Therefore, he has met his burden.

However, Caterpillar has offered a legitimate, non-discriminatory reason for its failure to promote Straughn.  According to Caterpillar, Straughn explained at his deposition that the team lead position that he sought was filled by Venecia.  (Dkt. # 22 at 11 (citing Cat. Straughn Dep. 29:7–10).)  "Had Venecia, as a team lead and Straughn, as a forklift driver, applied for the same team lead position in 2013, the fact that Venecia was already a team lead would provide a non-discriminatory reason for the decision."  (Id.)  Therefore, Caterpillar has met its burden to articulate a legitimate non-discriminatory reason for failing to promote Straughn.

Straughn provides no evidence that this reason is pretext.  The only evidence that Straughn offers in rebuttal is that "[o]ne of his supervisors at Caterpillar, Melchor De Los Santos testified that there was no reason he could think of why Mr. Straughn had not yet been promoted to Lead Man and that he believed Mr. Straughn was qualified for the position."  (Dkt. # 26 at 17 (citing id., Ex. 5 at 23:11–18).)  This is insufficient evidence of pretext.  "The plaintiff must rebut each nondiscriminatory reason articulated by the employer."  Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir. 2003).  A plaintiff can only rebut each nondiscriminatory reason with evidence of disparate treatment or a showing that the proffered explanation is false or unworthy of credence.  Laxton, 333 F.3d at 578.

Santos's comment does neither.  His general remarks about Straughn's

45

qualifications do not suggest that Caterpillar's explanation comparing Straughn with Venecia is false.  See Price v. Fed. Exp. Corp., 283 F.3d 715, 722 (5th Cir. 2002) (finding even specific allegations undermining defendant's nondiscriminatory reason to be unconvincing).  Even if the Court assumed that Santos's testimony established that Venecia and Straughn were equally qualified for the position, which it does not, the evidence would nevertheless be insufficient.  See Price, 283 F.3d at 722 ("Showing that two candidates are similarly qualified does not establish pretext under this standard.").  Because Straughn has failed to rebut Caterpillar's legitimate, non-discriminatory reason for failing to promote him, his claim fails.  Therefore, the Court **GRANTS** Caterpillar's Motion for Summary Judgment as to the failure to promote claim.

     C.     <u>Retaliation Claim</u>

     Finally, Caterpillar argues for summary judgment against Straughn on the retaliation claim for two reasons: (1) that the claim is barred because it was not brought as part of his EEOC charge; and (2) that the claim is barred because Straughn failed to establish the second element of his prima facie case.  (Dkt. # 22.) Because the Court finds that no adverse employment action occurred, it does not address whether the claim would have been barred.

     1.     <u>Whether an Adverse Employment Action Occurred</u>

     Unlike in the Title VII discrimination context, an adverse employment

46

action in the retaliation context is not limited to ultimate employment decisions, such as hiring, granting leave, discharge, promotion, and compensation. McCoy v. City of Shreveport, 492 F.3d 551, 558 (5th Cir. 2007). Rather, the action can be something that "a reasonable employee would have found . . . [to be] materially adverse." Aryain, 534 F.3d at 484 (quoting Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68).

      Although "a lateral reassignment to a position with equal pay could amount to a materially adverse action in some circumstances," it may not when the job is not more arduous or less prestigious, when the plaintiff does not view the transfer as a demotion, and when the transfer does not result in a pay cut. Id. at 485. In making the determination, courts consider persuasive whether the action would have dissuaded a reasonable employee from lodging a complaint of discrimination. Id. at 484.

      Straughn contends that the fact that he was moved, as opposed to Medina, following his complaints about Medina's conduct, constituted an adverse employment action in retaliation for his complaint. (Dkt. # 26 at 18.) However, according to Straughn's deposition testimony, the move did not cause him to lose his job, a demotion, or reduction in pay. (Cat. Straughn Dep. at 87:1–13.) Nor are there any allegations that Straughn viewed the change as impacting the prestige or difficulty of his job. His only contention is that Medina should have been moved,

47

rather than him.

The Court is unconvinced.  The transfer was a direct response to help Straughn avoid any future aggravating contact with Medina.  Such a transfer would not have dissuaded a reasonable employee from lodging a complaint of discrimination; in fact, it might encourage employees experiencing discrimination from their coworkers to lodge complaints.  Moreover, the Court agrees with Caterpillar that "it turns retaliation law on its head for Straughn to contend that the very decision that the EEOC described as remedial action by Caterpillar, can later support his claim of retaliation."  (Cat. Mot. at 7.)

Therefore, the Court finds that Straughn has failed to demonstrate a prima facie case for retaliation.  Accordingly, the Court **GRANTS** Caterpillar's Motion for Summary Judgment as to the retaliation claims.

<u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** TPA's Motion to Strike (Dkt. # 29) and **GRANTS IN PART AND DENIES IN PART** TPA's Motion for Summary Judgment (Dkt. # 23). Accordingly, the failure to promote claim against TPA is **DISMISSED**, leaving the hostile work environment claim against TPA standing.  Additionally, the Court **GRANTS** Caterpillar's Motion for Summary Judgment (Dkt. # 22).  Accordingly, the Court **DISMISSES** all claims against Caterpillar.

48

**IT IS SO ORDERED**.

**DATED**: San Antonio, Texas, October 22, 2014.

David Alan Ezra
Senior United States Distict Judge